HARRY VINE et al., complainants,

*v.*

ROBERT W. KENNEDY COMPANY et al., defendants.

[Decided August 7th, 1924.]

**Contracts—Building—Mechanics' Liens—Contractor's Liability to Finish Work Without Reference to Owner's Defaults— Amounts Due Stop-notice Claimants—Priorities of Stop- notice Claimants.**

*Mr. Martin P. Devlin,* for the complainants.

*Messrs. Geraghty & Weelans,* for the defendant Sweeny.

*Mr. James J. McGoogan,* for the defendants Watson & Company et al.

*Mr. Linton Satterthwaite,* for the defendants Tattersall Company et al.

*Mr. William Cooper,* for the defendant Independent Brick Company.

*Messrs. Josephson & Josephson,* for the defendants Max Williams et al.

*Mr. Philip M. Chamberlain,* for the defendant William Cooper.

BUCHANAN, V. C.

Complainants, owners of a recently erected pair of houses, being sued by several stop-notice claimants and by the contractor Sweeny, filed bill in the nature of interpleader, tendering payment into court of the sum of $1,284 (which they admitted to be due from them to the contractor) and such additional sum, if any, as might be determined to be due from them to the contractor. After the proofs at the hearing they admit liability of $1,424.

The first issue (there being no contest as to complainants' right to relief) is as to the amount for which complainants are liable. The contract (which, with the specifications, was duly filed under the Mechanics' Lien act) binds Sweeny to erect the two houses for complainants, for which they were to pay him $12,600 in four installments, as follows: (1) $2,000 when first floor joists are on; (2) $3,000 when tile roof is on; (3) $3,000 when plastering is done; (4) $4,600 when buildings are completed.

There is a further clause that "If the owners do not have the $3,000 for third payment, the said Frank L. Sweeny will have to furnish the same by getting someone to take a ($7,600) mortgage on property unless owners can get same."

The contract, which is on a printed form, contains no other unusual provisions. No architect was named therein (nor intended so to be), so that the printed provisions as to the architect are surplusage. The contract was made April 21st, 1922, and specified October 1st, 1922, as the date when the house should be completed.

The first and second payments were made: the third payment was not made. It is not seriously disputed that it became due and payable, though there is a conflict as to just when it became due. There is no doubt in my mind but that it was due on October 1st, at least. On October 7th the contractor abandoned the job, as he himself admits (although he, of course, claims he was justified in so doing).

Complainants, on October 19th, proceeded to have the houses completed by others, and paid therefor (omitting payments for some minor alterations and extras) $6,226. Deducting this from $7,650 (the $7,600 unpaid under the contract, plus $50, which they say they agreed to pay Sweeny for drawing the plans), leaves the $1,424, which they admit to be due.

It is, of course, undisputed that, unless Sweeny had legal justification for abandoning the contract, complainants were entitled to have it completed by others, and (as against Sweeny, at least) to deduct the reasonable cost thereof from the unpaid balance of the contract price. Herein lies the crux of the case.

There was considerable argument as to the clause about raising the $7,600 on mortgage, but I am unable to see that this is of any great materiality. Whether or not it ever was Sweeny's duty to procure a mortgage for complainants, the proofs show that he *did* procure two parties able and willing to make the mortgage loan—first, the Hanover Trust Company, and secondly, after being told by complainant they preferred a private individual as mortgagee, a client of Dickinson & Company. Complainants, after finding that they would be required to pay the usual broker's commission to Dickinson & Company, went back to the Hanover Trust Company. Sweeny performed all that the contract required him to do in this behalf.

The important question is whether or not Sweeny was legally justified in abandoning the job on October 7th.

The evidence is conflicting as to the occurrences that took place at that time. The contract required the owners to make a payment of $3,000 when the plastering was done. I am satisfied from the entire evidence that on October 1st (and probably for a little while before that) the progress of construction had substantially reached that point.

A few square feet of one wall in the bathroom in each house remained unplastered, but it appears that this was customary, and was done so as to permit certain work to be done by the plumbers. The "dashing" of a cellar wall had

not been done, nor certain outside stucco work, but these were not part of what is meant by builders as "plastering." Moreover, a little of the trim had been put on in one house, and most of it in the other, so that in this respect it had progressed beyond the plastering. Complainants, who were foreigners and unfamiliar with building, evidently had too literal an idea of the meaning of "when the plastering is done," and thought that Sweeny was not entitled to the $3,000 as long as the unplastered holes in the bathroom wall remained and the dashing and stucco was not completed, and from this arose some argument between them and Sweeny as to his being entitled to the $3,000.

It further appears by Sweeney's own admission that for some time prior to October 7th he had been proceeding very slowly with the work. He says this was because the owners had been dilatory in making the prior payment (which was not contradicted). On October 5th, Philip Vine, as attorney for the owners, wrote Sweeny a letter that "unless you resume active work" on the buildings and "complete same very soon" (the contract date for completion was October 1st), the owners would have the work completed by another contractor and charge loss or damage to Sweeny. Sweeny admits getting this letter on October 6th.

This was the situation on October 7th. On that day Sweeny says he asked Vine (one of the owners) "what he was going to do about some money; I thought it was time to come through. They said they were not going to pay any until I was done. * * * When they told me they were not going to pay me any money I quit." After that date he did no more work. And, at another point in the hearing, Sweeny said, "Mr. Vine told me he wasn't going to pay me no money till the job was complete," and that was the reason Sweeny didn't get lien releases for the intending mortgagee. Chris Wagner, a workman then and now in Sweeny's employ, also testified that Vine asked him (Wagner) "a week or so before we quit" why Sweeny didn't go ahead with the job, and said "he would pay him the money

when he gets the work done, what was coming to him," that he would pay him when "the whole job was completed."

On the other hand, Berkowitz, one of the owners, says "I asked Sweeny what's the matter. He said he wanted the other $3,000. We said we would give it to you near time it is due. He said, 'to hell with the houses;' he was mad at that time; that is the way he went out." Vine, the other owner, says that a day or two before Sweeny quit he had a conversation with him, Sweeny asking for the $3,000 pay-. ment, and he (Vine) saying that it wasn't due yet, and that Sweeny had agreed to get the money (evidently referring to the clause as to procuring a mortgagee), and further re-minding Sweeny that in the negotiations for the contract they had told him that they had only $5,000, and hence he would have to wait for the balance of the contract price until the job was completed, which resulted in the insertion of the clause for the third payment of $3,000 and the clause that Sweeny should procure the mortgagee. Sweeny replied, "If I don't get any money I'm going to quit." A day or two later (Vine testifies) he said to Sweeney that he would give him enough money for men and materials for the few days until Sweeny could furnish lien releases to the intend-ing mortgagee, so that Sweeny could proceed with the work; that Sweeny replied he didn't need it, "but when I went he said I want $3,000; that was the last thing. I seen I couldn't do nothing with him."

I am satisfied that the owners did not tell Sweeny that they would not pay him the $3,000 or would not make any further payment until the houses were completely finished. It is unlikely that they would tell him such a thing in the face of the explicit contract provision, and in view of the fact that they were then engaged in obtaining the mortgage loan so that they could pay the $3,000. I have no doubt (particularly after having seen Vine and Berkowitz and heard them speak—they speak English fairly well—but, naturally, quite differently from persons American born) that they told him they wouldn't pay him until the plaster-ing was completed (they believing that it was not yet com-

pleted), and Sweeny mistakenly understood them as refusing to pay till the whole construction job was completed. Whether the fault for this misunderstanding rests on the owners or on Sweeny I cannot say—the evidence is insufficient to disclose this. But Sweeny is, as to this phase of the case, in the position of a party plaintiff, seeking to recover a contract payment, and the burden of proof is upon him to establish his right to it, to establish that his failure to perform himself was due to the fault of the other party. The stop-notice claimants also stand in Sweeny's shoes. Sweeny (and these claimants) have failed to establish that Sweeny was legally justified in abandoning the contract on October 7th.

The law in this state was settled by the court of errors and appeals in *Blackburn* v. *Reilly, 47 N. J. Law 290* (at *p. 308*), that in ordinary continuing or installment contracts "defaults by one party in making payments or deliveries will not release the other party from his duty to make the other deliveries or payments stipulated in the contract, unless the conduct of the party in default be such as to evince an intention to abandon the contract or a design no longer to be bound by its terms," and the opinion goes on to point out that the party complaining of a breach may sue for damages for such breach.

That case was a case of contract for sale, with installment deliveries and payments. So, also, was *Empire Rubber Manufacturing Co.* v. *Morris, 77 N. J. Law* (at *p. 501*), where the same principles were reiterated by the same court; but I can see no distinction between such contracts and the one now *sub judice* which would prevent the applicability of these principles in the present case. In this building contract the promises of the owners to make the installment payments are entirely independent of the promise of the contractor to perform and complete the work. It was open to Sweeny to sue the owners for the $3,000 payment, but their breach in that behalf did not evince an intention to abandon the contract and no longer to be bound by its terms,

and hence did not justify refusal of further performance on his part.

In *Potts* v. *Point Pleasant Land Co., 49 N. J. Law 412,* the rule was by the Supreme Court deemed applicable to a somewhat similar contract, where one party agreed to grade certain lands and the other party was to make monthly payments. The court pointed out that the covenants were independent of each other, and hence that a failure to make payment, although it was evidential in arriving at a determination as to whether the owner had evinced an intention to abandon the contract, was not in itself an abandonment.

Moreover, it seems to me that the express terms of the present contract lead to the conclusion that the parties did not intend that a breach by the owners in an installment payment should justify cessation of work by the contractor. For by the "fourth" paragraph thereof it is specifically provided that "should the contractor at any time during the progress of said work refuse or neglect to supply a sufficiency of materials or workmen, the owner shall have power to provide materials and workmen, after three days' notice in writing being given, to finish the said works, and the expense shall be deducted from the amount of the contract."

This clause makes no exception or excuse in favor of the contractor for default by the owner in payment of a matured installment.

Not only did Sweeny quit the job on October 7th, and fail to supply a sufficiency of workmen and materials in response to the notice of October 5th received by him on October 6th; there was a further conversation and arrangement between him and Vine, the attorney for the owners. Sweeny fixes this as on October 13th; Vine says it was a few days earlier. Taking Sweeny's own testimony, he (Sweeny) made no mention to Vine of the latter's letter of October 5th; no denial of its accusations. He says Vine told him that the Hanover Trust Company (the intending mortgagee) had "the papers," and that Harry Heher (the trust company's attorney) had the searches, and that the money (the mortgage loan) would be coming in inside of a week,

and asked him if he wouldn't go back and resume work. "I said if what he told me was true, I would go back to work on the following Tuesday" (which would have been October 17th). He did did not go back to work on that day. The reason he gives is that he went to the Hanover Trust Company on October 14th, "and there was no papers there." This, of course, is merely hearsay testimony from Sweeny; he produced no competent evidence to show that "no papers" were at the Hanover Trust Company. The evidence is to the contrary, from the testimony of Mr. Vine (the attorney) and Mr. Dugan, the vice-president of the Hanover Trust Company.

My conclusion is therefore that complainants were justified in proceeding to have the work completed by others, which action they took on October 19th, by engaging Mr. Teitz to do the job, and are entitled to charge against Sweeny the fair and reasonable cost of such completion.

The actual cost of that completion was $6,226, and I am satisfied from the evidence that this was not other than a fair and reasonable price. The arrangement between complainants and Teitz was on a cost plus ten per cent. profit basis, and it was argued that this was not a proper or reasonable arrangement; that complainants should have asked for bids at a contract price. The arrangement made was not unfair or unreasonable, if Teitz was honest and capable, and he impresses me as such. Moreover, complainants testified that they had asked for and obtained bids for a contract price, but thought they were too high, and hence adopted the other course.

Another question is raised by the stop-notice claimants. As has been said, on or prior to October 1st, Sweeny became entitled to a payment of $3,000 from complainants, and could have sued complainants for that sum and recovered. Of course, as against Sweeny, complainants are entitled to set-off the cost of completion against this $3,000 (as well as against the final $4,600 installment, which had not accrued, due to Sweeny). But are they entitled so to do, as against the stop-notice claimants? If they are, then the fund avail-

able for distribution to the stop-notice claimants is only $1,424 (as hereinbefore set forth); if they are not, then the fund is $3,000.

(It should be added here that in arriving at the balance of $1,424, *supra,* determination was necessarily made of another disputed question of fact, namely, the amount agreed 'to be paid by complainants to Sweeny for drawing the plans. They said $50; Sweeny said $320. The burden of proof being upon Sweeny, the issue was resolved against him.)

That the stop-notice claimants' (whose combined claims exceed $3,000) are entitled to the $3,000, instead of only $1,424, as contended by complainants, seems to me definitely determined by *Stone Post Co.,* v. *Corcoran, 80 N. J. Law 549;* approved and followed unanimously by the court of errors and appeals in *Moorestown Supply Co.* v. *Burns, 91 N. J. Law 609.* Sweeny is, of course, liable to complainants for the excess of $1,576.

We come now to the question of priorities among the stop-notice claimants. The notice of the Williams Metal Ceiling Company was the first one served. This claim must be rejected. the stop-notice claims $300 as the amount due. That this was in fact true, the evidence is insufficient to substantiate. Sweeny denies it, and the burden of proof is, of course, upon the claimant.

The next notice served was that of William Cooper, whose claim is $200. The only argument made against this claim is that there was no evidence presented of a demand and refusal preceding the service of the stop-notice. The $200 was the balance of a total contract price of $300, of which $100 had been paid. Cooper testified that when the $100 was paid the whole $300 was due; that Sweeny said he was pinched and promised to pay the other $200 when he got the $3,000 payments from complainants. I think that this is sufficient evidence of a demand and refusal under the authorities, and this claim will be allowed.

The next claims are: Watson & Company, $1,192.59; Kennedy Company, $954.87; Henry R. Fell Company,

$327, and Independent Brick Company, $573. There is no dispute either as to the validity or order of priority of these claims, and, inasmuch as they exceed the $3,000 fund, there is no necessity to consider further claims.

Costs should be allowed, out of the fund, to the successful claimants only. Costs will be allowed to complainants against the defendant Sweeny, as well as decree for the $1,576 excess above mentioned.